IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 22-11516


THE HIGHLAND CONSULTING GROUP, INC.,

Plaintiff-Appellee,

v.

JESUS FELIX MINJARES SOULE,

Defendant-Appellant.



Appeal from the United States District Court for the Southern District of Florida
Case No. 9:19-Cv-81636-Rosenberg/Reinhart

---

**BRIEF OF APPELLEE/PLAINTIFF, THE HIGHLAND CONSULTING GROUP, INC.**

---

Stephanie L. Serafin
Rebecca Mercier Vargas
Kreusler-Walsh, Vargas & Serafin, P.A.
501 South Flagler Drive, Suite 503
West Palm Beach, FL  33401
Telephone:  (561) 659-5455

*Counsel for Appellee, The Highland Consulting Group, Inc.*

**No. 22-11516**
**The Highland Consulting Group, Inc.**
**v. Jesus Felix Minjares Soule**

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Appellee, The Highland Consulting Group, Inc., pursuant to Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1, 11th Cir. R. 26.1-2(a) and 11th Cir. R. 26.1-3, certifies that the following interested persons/entities represent a complete list of all trial judges, attorneys, persons, association of persons, firms, partnerships or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

Alfonso, Sixsy Lourdes – former attorney for Defendant

Allison L. Friedman, P.A. – attorneys for Plaintiff

Bristow, J. Chris – attorney for Plaintiff

Cheeseman, Kimberly – former attorney for Defendant

Coleman, Gregory William – attorney for Plaintiff

Critton Luttier & Coleman, LLP – attorneys for Plaintiff

Crow, Michael Carter – former attorney for Defendant

Friedman, Allison Levey – attorney for Plaintiff

Griffin Goodman, Holly – former attorney for Defendant

Gunster, Yoakley, Stewart, P.A. – former attorneys for Defendant

HCG Advisors Mexico – related entity of Plaintiff

Hicks, Mark – attorney for Defendant

Hicks, Porter, Ebenfeld & Stein, P.A. – attorneys for Defendant

Highland Canada (ULC Nova Scotia) – related entity of Plaintiff

Highland Consulting Group Canada Ltd. – related entity of Plaintiff

Highland Group Brazil Consultoria Empresaria Ltda. – related entity of Plaintiff

Kain, Shannon Frances – attorney for Defendant

Kerridge, James G. – 100% owner of Plaintiff

Kreusler-Walsh, Jane – attorney for Plaintiff

Kreusler-Walsh, Vargas & Serafin, P.A. – attorneys for Plaintiff

Minjares Soule, Jesus Felix – Defendant

Norton Rose Fulbright US LLP – former attorneys for Defendant

Reinhart, Bruce E., U.S. District Court Magistrate Judge

Rosenberg, Robin L., U.S. District Court Judge

Serafin, Stephanie L. – attorney for Plaintiff

Silva Blanco, Jesika – former attorney for Defendant

The Highland Consulting Group, Inc. – Plaintiff

The Highland Consulting Group International – related entity of Plaintiff

The Highland Group, Inc. – related entity of Plaintiff

The Highland Group SAS (France) – related entity of Plaintiff

The Highland Group Sinapore Pte. Ltd. – related entity of Plaintiff

The Plaza Group, Inc. – related entity of Plaintiff

Vargas, Rebecca Mercier – attorney for Plaintiff

Vosseller, Sharon Rose – attorney for Defendant

Wermuth, John Michael – attorney for Defendant

Wermuth Panell & Ortiz – attorneys for Defendant

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellee/Plaintiff, The Highland Consulting Group, Inc., believes oral argument is unnecessary. The briefs and record provide a sufficient basis upon which this Court can decide the issues in this appeal.

# **TABLE OF CONTENTS**

**Page**

Certificate of Interested Persons     C-1

Statement Regarding Oral Argument     i

Table of Contents     Ii

Table of Citations     Iv

Statement of the Issues     1

Statement of the Case and Facts     2

Summary of Argument     20

Argument     21

**I.  THIS COURT SHOULD AFFIRM THE JUDGMENT ON HIGHLAND'S DTSA CLAIM BECAUSE HIGHLAND PROVED IT OWNS THE TRADE SECRETS.**     21

    A.  Standard of review     21

    B.  The evidence supports the jury's verdict in favor of Highland on the DTSA claim.     22

    C.  Highland had standing to sue Minjares for misappropriation of trade secrets under the DTSA.     31

**II.  MINJARES IS NOT ENTITLED TO A NEW TRIAL ON HIGHLAND'S DTSA CLAIM BECAUSE THE EVIDENCE SUPPORTS THE JURY'S VERDICT THAT HIGHLAND OWNED THE TRADE SECRETS.**     33

# TABLE OF CONTENTS, CONT'D

**Page**

    A.    Standard of review     33

    B.    The jury's verdict in favor of Highland on the DTSA     33
            claim is supported by the great weight of the
            evidence and must be upheld.

Conclusion     34

Certificate of Compliance     35

Certificate of Service     36

# TABLE OF CITATIONS

**Case**                                                                 **Page**

*APA Excelsior III L.P. v. Premiere Techs., Inc.*,

    476 F.3d 1261 (11th Cir. 2007)                                      23

*\*Cleveland v. Home Shopping Network, Inc.*,

    369 F.3d 1189 (11th Cir. 2004)                                  21, 22

*Focused Impressions, Inc. v. Sourcing Grp., LLC*,

    No. 19-cv-11307-ADB, 2020 WL 1892062 (D. Mass. Apr. 16, 2020)    32

*Ins. Co. of N. Am. v. Valente*,

    933 F.2d 921 (11th Cir. 1991)                                   33, 34

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992)                                                 31

*MidlevelU, Inc. v. ACI Info. Grp.*,

    989 F.3d 1205 (11th Cir. 2021)                                      21

*Phyllis Schlafly Revocable Trust v. Cori*,

    4:16-cv-01631-JAR, 2022 WL 898760 (E.D. Mo. Mar. 28, 2022)          32

*Pioneer Int'l (USA) Inc. v. Reid*,

    No. 2:07-cv-84-FtM-34DNF, 2007 WL 9718721

    (M.D. Fla. Oct. 9, 2007)                                            32

# TABLE OF CITATIONS, CONT'D

**Case**                                                                                    **Page**

*Reeves v. Sanderson Plumbing Prods.*,

    530 U.S. 133 (2000)                                                                      22

*Rosenfield v. Wellington Leisure Prods., Inc.*,

    827 F.2d 1493 (11th Cir. 1987)                                                             34

*\*Title Source, Inc. v. HouseCanary, Inc.*,

    612 S.W.3d 517 (Tex. Ct. App. 2020)                                                        27

*Zabit v. Brandometry, LLC*,

    540 F. Supp. 3d 412 (S.D.N.Y. 2021)                                                        32


## Statutes, Rules & Regulations

18 U.S.C. § 1836                                                                            22

18 U.S.C. § 1839                                                                            1, 22

Fed. R. Civ. P. 50                                                                          21

## STATEMENT OF THE ISSUES

Whether the district court correctly denied Minjares's motion for judgment as a matter of law and motion for new trial because Highland produced sufficient evidence proving it owns the trade secrets at issue, pursuant to the Defend Trade Secrets Act (DTSA), 18 U.S.C. §1839(4).

# STATEMENT OF THE CASE AND FACTS

The sole issue in this appeal is whether Highland proved it owned the trade secrets at issue. Minjares does not challenge the jury's findings that the information and documents are trade secrets, that he misappropriated them, or that Highland suffered damages. This Statement of the Case and Facts focuses on Highland's evidence of ownership. Minjares's primary argument is the district court erred by failing to grant his motion for judgment as a matter of law. As such, the facts must be viewed in the light most favorable to Highland with reasonable inferences drawn in Highland's favor.

## A.     The Highland Consulting Group, Inc.

James Kerridge founded The Highland Consulting Group, Inc. ("Highland") approximately 30 years ago and is its Chief Executive Officer (Doc. 341, p. 113).[1] Highland is a global consulting firm that offers consulting services to a wide range of customers and industries (Doc. 341, pp. 115-16). Highland employs only senior consultants with at least 15 years of experience (Doc. 341, p. 115). Brian Saville is Highland's Chief Financial Officer (Doc. 342, p. 139).

---

[1] Highland follows Minjares's format for citations to the district court record and trial transcript. The 4 volumes of trial transcript are found at Docs. 341, 342, 343, and 344. Highland cites to the transcript page number assigned by the court reporter. Highland's trial exhibits filed under seal are referred to as "Plf. [Ex. #, p. #]."

Appellant/defendant, Jesus Minjares Soule ("Minjares"), was a senior-level consultant for Highland in 2019, when the events leading to this lawsuit took place (Doc. 341, p. 126). He began working for Highland in 2012 as an economic analyst (Doc. 341, p. 122). When he began his employment, he entered into a Non-Disclosure, Non-Solicitation and Compliance Agreement with Highland (Doc. 341, pp. 122-23; Doc. 241-4). Minjares agreed, among other things, to receive Highland's confidential information in "strict confidence" and to maintain and assist Highland in maintaining the secrecy of this information (Doc. 241-4, p. 1). He also agreed to return all of Highland's confidential information upon his termination (Doc. 241-4, p. 1).

Highland has developed a process for selling a consulting job, which focuses on establishing a trust relationship with senior executives at the target company (Doc. 341, pp. 117-18). Highland is a smaller firm, so it cannot rely on name recognition, alone (Doc. 341, p. 117). Kerridge testified about Highland's processes to acquire clients and develop proposals for those clients, as well as the trade secrets Highland developed to use in those processes (Doc. 341, pp. 117-20, 146-93; Doc. 342, pp. 43-45). Kerridge methodically testified that Highland was the owner of the trade secrets (Doc. 341, pp. 147-48, 153, 157, 160-61, 187; Doc. 342, pp. 11-12, 26).

Highland begins its sales process with telemarketing (Doc. 341, pp. 117-18). It uses a team sales approach where a sales executive and business development partner work together to introduce Highland to the potential client and establish trust (Doc. 341, p. 118). Highland then develops a proposal for the potential client using an analytical process it developed, called Discovery & Design® (Doc. 341, pp. 119-20, 131). During the Discovery & Design® phase, Highland goes into the client's organization to define the issues, identify the barriers, and put together a customized consulting program to overcome those barriers (Doc. 341, p. 119).

After the client accepts Highland's proposal, Highland begins the process of performing the consulting assignment (Doc. 341, p. 118). This process starts with staffing the job and determining how long the job will take to complete (Doc. 341, pp. 118-19). After the assignment is complete, Highland closes out the project, documents it, and archives it for future use. (Doc. 341, p. 119).

Highland conducts assignments in the United States and in foreign countries (Doc. 341, pp. 117, 125). When required, Highland establishes foreign affiliates to meet local regulations and tax requirements (Doc. 341, pp. 125-26; Doc. 343, pp. 58-59). These affiliate companies are owned by The Plaza Group, Inc., which is also 100% owned by Kerridge (Doc. 342, pp. 65-66; Doc. 343, p. 58; Doc. 242-2).

Once Highland finishes a project in a geographic location, the affiliate is often closed (Doc. 341, p. 125).  HCG Advisors, Highland's Mexican affiliate company, was formed in 2014 (Doc. 341, p. 125; Doc. 343, pp. 58-59; Doc. 241-5, p. 3).

In Highland's opening statement, Highland's counsel explained that the name "Highland" referred to his client, the plaintiff, The Highland Consulting Group, Inc. (Doc. 341, p. 89).  Throughout Kerridge's testimony, Kerridge generally referred to the plaintiff as "Highland," not its full name, The Highland Consulting Group, Inc. Kerridge occasionally referenced "The Highland Group" or "The Highland Group Consultants."  He clarified that "The Highland Group Consultants" is a trade name Highland uses in the marketplace, and The Highland Consulting Group, Inc., is the name of the legal entity bringing the lawsuit (Doc. 342, p. 64).

## B.  Highland's consulting project for the Mexican mining company, Fresnillo, at its Saucito mine

Highland began performing consulting work in the mining industry in 2005 (Doc. 341, p. 116).  Highland has worked with some of the largest mining companies in the world on 5 continents (Doc. 341, p. 117).

Fresnillo PLC is the largest silver miner in the world and the largest gold miner in Mexico (Doc. 341, p. 127).  In 2013, Highland began targeting Fresnillo as

a potential client (Doc. 341, pp. 127-28). It took Highland several years of significant sales efforts to secure Fresnillo as a client (Doc. 341, p. 128; Doc. 342, p. 141). Finally, in 2019, Highland was awarded a contract to perform a Discovery & Design® for Fresnillo at its Saucito mine site in Mexico (Doc. 341, pp. 128-29; Doc. 342, pp. 112-13, 141-42). The Highland Consulting Group, Inc. contracted with Fresnillo during the Discovery & Design® phase (Doc. 341, pp. 128-29; Doc. 342, pp. 112-13, 142). During the Discovery & Design®, Highland developed a 36-week, $2,992,000 project plan for Fresnillo (Doc. 341, pp. 131-32; Doc. 342, p. 143; Plf. Ex. 24). Highland's trade name, The Highland Group Consultants, was displayed on the proposal (Plf. Ex. 24).

Highland, through its Mexican affiliate, HCG Advisors, entered a contract with Fresnillo upon acceptance of the proposal (Doc. 341, pp. 131, 133; Doc. 342, p. 142). Highland used its Mexican affiliate, HCG Advisors, due to the contractual length of the project, to comply with Mexican tax regulations (Doc. 342, pp. 142-43). Minjares was in charge of the project phase of the consulting implementation project at the Saucito mine for Highland (Doc. 341, p. 132).

Highland entered into a Mutual Confidentiality Agreement with Fresnillo before the consulting project began (Doc. 241-15; Doc. 341, pp. 129-30). The

Agreement required both companies to maintain as confidential each other's non-public and proprietary information (Doc. 241-15, p. 1). Kerridge identified specific trade secret work papers that Highland shared with Fresnillo under this agreement, which Minjares later distributed outside Highland's organization for his own benefit (Doc. 342, pp. 45-46). Saville signed the Mutual Confidentiality Agreement on behalf of The Highland Consulting Group, Inc. (Doc. 241-15, p.4; Doc. 342, p. 140-41). Minjares was tasked with having the Mutual Confidentiality Agreement countersigned by Fresnillo (Doc. 342, p. 141). Saville testified that the countersigned Agreement was on the USB drives that were eventually returned to Highland by Minjares's counsel on January 25, 2020 (Doc. 342, p. 141).

### C. Fresnillo prematurely terminated the project a day before Minjares resigned from Highland.

Fresnillo terminated the Saucito mine project on September 25, 2019, which was week 19 of the 36-week contractual period and before Highland could complete its work under the contract (Doc. 341, p. 134; Doc. 342, p. 143). Highland had no indication that Fresnillo was unhappy with Highland's work (Doc. 341, p. 134; Doc. 342, p. 144). In fact, Highland and Fresnillo had been in discussions regarding additional projects at other Fresnillo mine sites (Doc. 341, pp. 134-35).

Fresnillo communicated the termination of Highland's project through an email to Minjares, which Minjares forwarded to Kerridge and Saville (Doc. 241-7; Doc. 341, p. 135). When Fresnillo terminated the project, Highland had approximately $1,200,000 left on the contract (Doc. 342, p. 144; Doc. 343, pp. 53-54). The day after receiving Fresnillo's termination notice, Minjares resigned from Highland (Doc. 341, p. 137-38). He made his resignation effective September 25, 2019—the same day the Fresnillo project was terminated (Doc. 341, p. 138).

### D. Minjares took over the Saucito project through his family-owned company, MSC.

Immediately after resigning, Minjares, through his family-owned company, Minjares Soule Consultores de Negocios ("MSC"), began billing the project at the Saucito mine using subcontractors that had previously worked for Highland on this project (Doc. 341, p. 136; Doc. 342, pp. 28, 144). The Highland contract for the Saucito mine project and the MSC contract to complete that project were nearly identical (Doc. 341, p. 137; Doc. 342, pp. 57-59). MSC collected over 54 million Mexican pesos, approximately $2,750,000 U.S. dollars, for this work (Doc. 343, pp. 54-55, 170). Kerridge and Saville testified that MSC and Minjares could not have completed the Saucito mine project without using Highland's valuable trade secrets (Doc. 341, p. 193; Doc. 343, pp. 51-52).

**E.    Minjares refused to return Highland's trade secrets and confidential information until Highland sued him.**

After Minjares resigned, Highland twice requested that he return all of Highland's data (Doc. 341, p. 144; Doc. 342, pp. 144-46).  In a letter summarizing the terms of his separation from Highland, Highland's Human Resources Manager stated, "You agree to return all company property in your possession within 1 week from the date of this letter including all access to Drop Box accounts or folders which contain project material owned by The Highland Group, Inc., specifically Fresnillo project documentation" (Doc. 342, p. 144-45; Doc. 241-11, p. 2).  The letter reinforced the terms of Minjares's Non-Disclosure, Non-Solicitation and Compliance Agreement—Minjares's contract with the plaintiff, Highland (Doc. 342, pp. 144-45).  That Agreement mandated Minjares return Highland's materials (Doc. 342, p. 144; Doc. 241-4).  Minjares failed to return any Highland data, in breach of the Agreement (Doc. 342, p. 146).


In December 2019, after the lawsuit was filed, Minjares's attorney sent Highland a letter stating that Minjares had no Highland information (Doc. 341, pp. 145-46; Doc. 342, p. 146).  However, in late January 2020, just days prior to project completion, Minjares's counsel returned 5 USB drives containing 15.4 gigabytes of Highland data (Doc. 341, p. 146; Doc. 342, p. 146).  This data included Highland's trade secrets (Doc. 341, p. 146; Doc. 342, p. 147).

**F.    The USB drives Minjares wrongfully retained contained numerous trade secrets belonging to Highland.**

Kerridge and Saville testified that Highland found its trade secrets within the files on the USB drives that Minjares belatedly returned to Highland (Doc. 341, pp. 146-93; Doc. 342, pp. 43-45, 147; Doc. 343, p. 49; Doc. 241-37).    Highland presented evidence of six categories of Minjares's misappropriations and gave multiple examples of misappropriated trade secrets within each category, each belonging to Highland (*Id.*).    While some of these trade secrets were used to perform the work at the Saucito project, Highland's trade secret claim did not arise from that particular consulting project, contrary to the statement in Minjares's brief, page 3. These trade secrets were used by Highland across its diverse range of consulting projects throughout the world, as its foundational documents.    On appeal, Minjares does not contest the jury's finding that these are trade secrets or that Minjares misappropriated them.    The sole issue is whether Highland proved it owned the trade secrets.

**1.    Highland's trade secrets**

Information on the USB drives included Highland's "One Highland" document (Doc. 341, p. 149).    Kerridge testified that One Highland was a trade secret that was developed by Highland (Doc. 341, pp. 148, 153, 157).    One Highland was developed in 2013, at a point in time when Highland had grown and expanded

throughout the country and the world (Doc. 341, p. 148). It is a book of guiding principles used by Highland across the globe so that it maintains uniformity in the way it conducts business (Doc. 341, p. 148). Kerridge described One Highland as "the bedrock of the firm" (Doc. 341, p. 148). He described 22 examples of trade secrets in One Highland (Doc. 341, pp. 146-58). One Highland contains the logo "The Highland Group Consultants" at the top of each page and the copyright for "The Highland Group" at the bottom of each page (Plf. Ex. 2). Kerridge and Saville later identified this logo as Highland's logo (Doc. 341, pp. 178, 187; Doc. 342, p. 150). There was no evidence this logo belonged to any other entity besides the plaintiff, Highland.

Highland's Mining Vertical – Best Practices is a 285-page document containing Highland's best mining practices (Doc. 341, pp. 147, 160-62). Highland's Mining Vertical document was developed by consultants employed by Highland (Doc. 341, pp. 160-61). It includes examples and guideposts for Highland's consultants in the mining sector (Doc. 341, 162). The Mining Vertical document contains the logo, "The Highland Group Consultants" at the top of all 285 pages—the same logo as One Highland—and "Copyright 2013 The Highland Group" in the footer of each page (Doc. 341, p. 178; Plf. Ex. 134). Kerridge and

Saville identified the logo "The Highland Group Consultants" as Highland's logo (Doc. 341, p. 178; Doc. 342, p. 150).

The USB drives that Minjares eventually returned contained a mining practices document with the same title and content as Highland's Mining Vertical document, but with the logo of a different organization, as sworn to by Highland's digital forensics expert at trial (Doc. 341, pp. 163-65, 170-71, 178; Doc. 342, pp. 132-33, 150; Plf. Exs. 134 & 135). Kerridge testified about 28 examples of Highland's trade secrets that were taken by Minjares from Highland's Mining Vertical document and inserted into another company's document without Highland's permission (Doc. 341, pp. 170-71).

Highland's digital forensic expert, Andrew Reisman, examined the metadata of both mining practices documents (Plf. Exs. 134 & 135). He testified both documents originated from the same document (Doc. 342, p. 132-33). They showed the same creation date, October 12, 2012, and the copied version (Plf. Ex. 135) contains several leftover references to "Highland" (Doc. 342, pp. 132-33). In addition, the names of the two documents were almost identical (Doc. 342, p. 133).

The USB drives also contained Highland's Prospectus model outputs (Doc. 342, pp. 14-16; Plf. Exs. 113, 116, 118). The Prospectus is a set of instructions, algorithms, and outputs that Highland uses to develop business proposals for prospective clients (Doc. 341, p. 147). The Prospectus allows Highland to competitively bid jobs to potential clients in a consistent manner across the world (Doc. 341, p. 147; Doc. 342, p. 14). In 2014, one of Kerridge's colleagues, Pat Burns, put together a model using proprietary intellectual property and financial algorithms to develop the Prospectus (Doc. 342, p. 14). Highland has used the Prospectus's financial model since then (Doc. 342, p. 15). Highland's Prospectus document contains the logo, "The Highland Group Consultants" (Plf. Ex. 113, p. 14).

Kerridge testified the Prospectus files and algorithms are Highland's confidential trade secrets (Doc. 342, p. 26). The Prospectus is password protected and stored internally in Highland's document storage system (Doc. 342, p. 15). The USB drives returned by Minjares after the lawsuit was filed contained evidence of the Prospectus files being used at the Saucito mine after Highland was terminated from the Saucito project (Doc. 342, pp. 17, 19-25; Plf. Exs. 116, 118).

Kerridge testified that these documents (One Highland, the Mining Vertical Document, and the Prospectus) are Highland's principal intellectual property because they are used for multiple Highland clients (Doc. 341, p. 147).

Also included on the USB drives were documents Highland compiled in anticipation of sales to potential clients, including Fresnillo (Doc. 341, p. 147; Doc. 343, pp. 46-47). One of these Highland sales documents was Plaintiff's Exhibit 136. This document was discovered on the computer server of Highland's competitor company, Accenture, during this lawsuit (Doc. 341, pp. 181-82; Plf. Ex. 136). While the document contained the name of Highland's competitor, the actual content of the document was Highland's trade secret information (Doc. 341, pp. 181-86). The document still contained references to Highland and the Highland logo was included in the presentation (Doc. 341, p. 181-82, 184, 187; Plf. Ex. 136, pp. 7, 13, 23). Contrary to Minjares's assertion in his brief, Kerridge testified the original document belonged to Highland:

> Q. Sure. Let me ask it this way. Is that Highland's logo that I have circled?
>
> A. Absolutely. We have Accenture's logo and Highland's logo, but **it was Highland's material, it was created by Highland**.

(Doc. 341, p. 187). Kerridge testified Highland created the original sales document for its sales presentation to Fresnillo for the Saucito project (Doc. 341, pp. 184-85, 187).

After Minjares left Highland, he was an employee of Accenture (Doc. 341, p. 181-82). Minjares emailed a copy of Plaintiff's Exhibit 136 to a third party without Highland's knowledge or consent while he was employed by Accenture (Doc. 341, p. 182). On March 17, 2020, the district court entered an injunction requiring Minjares to immediately return all Highland's material to Highland (Doc. 60, p. 16). Despite this court order, Minjares did not return this document to Highland (Doc. 341, p. 182).

Finally, Kerridge identified a replication of an executive presentation Highland prepared for Fresnillo (Doc. 342, pp. 8-11; Plf. Ex. 22). The replication was found on the USBs (Doc. 342, p. 9). Highland prepared this presentation to obtain the Saucito mine project from Fresnillo, and it was instrumental in Fresnillo awarding that contract to Highland (Doc. 342, p. 11). The original Highland presentation contained the logo, "The Highland Group Consultants" at the top of the cover page (Plf. Ex. 24; Doc. 342, p. 12). The replication masked Highland's logo (Plf. Ex. 22; Doc. 342, p.12-13). Kerridge testified the original document and the

replication both contained Highland data, which he detailed to the jury (Doc. 342, pp. 11-14).

## 2. Highland took measures to protect its trade secrets.

Highland presented evidence of the measures it takes to protect its trade secrets. Contrary to Minjares's assertion in his brief, it was clear that the plaintiff, Highland, owned and controlled the document storage systems where these documents were protected and stored. Kerridge testified as follows:

> Q. Okay. Does Highland have a documentation process to store its documents?
>
> A. **Yes**. As we started to get larger, as with all organizations, it became an issue of how do we archive our history and learn from it. **Highland** has three separate buckets, if you will, that we store.

(Doc. 341, p. 120; emphasis added).

Kerridge described Highland's three storage systems (Doc. 341, pp. 120-22). Highland uses a service called Sales Force to store its telemarking information and sales information (Doc. 341, p. 120). It uses a separate, cloud-based service called Share Point to store its intellectual property (Doc. 341, p. 120). Finally, it uses Drop Box during a project to share information between its consultants (Doc. 341, pp. 120-21). Highland pays for Drop Box or reimburses its consultants for the fee (Doc.

341, pp. 189-90; Doc. 342, p. 82).  After the project is over, the documents from Drop Box are uploaded to Share Point for protection (Doc. 341, p. 121).

All three storage systems are password protected and segmented by function (Doc. 341, pp. 121, 159).  Highland's employees and subcontractors who have access to these systems sign confidentiality agreements (Doc. 341, pp. 121-22, 149, 159-60).  One Highland and the Mining Vertical document are stored in Share Point, protected by a password, and are available only to Highland's senior leadership (Doc. 341, pp. 121, 148-49, 162).  The Prospectus is also password-protected (Doc. 342, p. 15).

### 3.     Highland's trade secrets are highly valuable.

Highland's trade secrets were developed using Highland's 30 years of consulting work and experience (Doc. 341, p. 179).  Not only do they represent significant value to Highland, but they also would be highly valuable to Highland's competitors.  In the hands of Highland's competitors, these trade secrets would shortcut the time and expense a competitor would need to develop its own methodologies, processes, examples and models (Doc. 341, pp. 180-81).

**G.    The jury returned a verdict for Highland on its DTSA claim, and the district court denied Minjares's motion for judgment as a matter of law and for new trial.**

Highland raised three claims against Minjares and also sought a temporary injunction relating to these claims (Doc. 1).  In Count 1, Highland alleged Minjares violated the Defend Trade Secrets Act and sought damages and injunctive relief (Doc. 1, pp. 11-12).  In Count 2, Highland sought a permanent injunction as a result of Minjares's failure to return Highland's data, which Minjares was required to do under the Non-Disclosure, Non-Solicitation and Compliance Agreement (Doc. 1, pp. 12-14).  In Count 3, Highland sought damages as a result of Minjares's breach of other provisions of the Agreement—specifically by providing services to Fresnillo, Highland's client (Doc. 1, pp. 14-15).  The parties agreed the Court would determine Count 2, Highland's claim for a permanent injunction (Doc. 343, pp. 18-19).


Minjares counterclaimed for breach of contract (Doc. 135).  He alleged Highland violated its employment contract by failing to timely pay salary and reimbursable expenses and failing to pay earned bonuses (Doc. 135, p. 5).  He raised a similar affirmative defense, alleging Highland committed the first material breach (Doc. 25, p. 17).


The jury rendered a verdict for Highland on Count 1, violation of the DTSA,

and awarded Highland $1,200,000 million in damages (Doc. 228, pp. 1-4). The jury specifically answered, "Yes," to the interrogatory jury verdict question, "The Highland Consulting Group, Inc. owns any of the Mining Practices processes and methodologies of One Highland, Discovery & Design™ methods, sales presentations with compilations of prior results, pricing formulas, or proprietary Prospectus algorithms." (Doc. 228, p. 1).

On Count 2, the jury found Minjares breached Highland's Non-Disclosure, Non-Solicitation and Compliance Agreement, but found in favor of Minjares on his affirmative defense that Highland materially breached the Agreement (Doc. 228, p. 5). The jury rendered a verdict in favor of Highland on Minjares's counterclaim, finding that although Highland breached the Agreement, Minjares suffered no damages as a result of that breach (Doc. 228, pp. 6-7).

Both parties moved for judgment as a matter of law at the close of the evidence and then renewed those motions post-trial (Doc. 343, pp. 193-200; Doc. 251; Doc. 252). The district court denied the motions (Doc. 343, pp. 200-02; Docs. 266-68). Minjares's motion for new trial was also denied (Doc. 268). The district court entered a final judgment in favor of Highland on Count 1 and Minjares's

counterclaim (Doc. 250).  The court entered judgment for Minjares on Counts 2 and 3 (Doc. 250).

# SUMMARY OF ARGUMENT

Highland proved it owns the trade secrets that Minjares misappropriated, causing Highland to suffer $1,200,000 in damages.  Highland's witnesses, including its 100% owner, James Kerridge, testified the trade secrets were developed by Highland and belong to Highland.  Highland takes steps to protect its trade secrets from the public and to safeguard them when they are used during consulting projects by its affiliate companies, employees, subcontractors, and clients.  The district court properly respected the jury's verdict and denied Minjares's motion for judgment as a matter of law.  On appeal, Minjares failed to meet its burden to show he is entitled to judgment as a matter of law or a new trial.

Minjares attempts to create confusion where none exists.  Highland fully explained its corporate structure to the jury, including its use of foreign affiliate companies to conduct consulting projects in foreign countries to comply with local regulations and tax laws.  The existence of these affiliates did not confuse the jury and did not undermine Highland's evidence that it owned the trade secrets.  To the contrary, Highland's corporate structure supports its ownership of the trade secrets,

many of which were developed as foundational documents for use in all of Highland's projects across industries and geographical locations.

For all of the same reasons, Highland had standing to bring its trade secret claim against Minjares. Highland, the owner of the trade secrets, suffered an injury-in-fact when Minjares misappropriated Highland's trade secrets. This was a fact question for the jury, and the jury's finding is supported by the evidence. This Court should affirm the final judgment.

## ARGUMENT

## I. THIS COURT SHOULD AFFIRM THE JUDGMENT ON HIGHLAND'S DTSA CLAIM BECAUSE HIGHLAND PROVED IT OWNS THE TRADE SECRETS.

### A. Standard of review

The district court's order denying Minjares's motion for judgment as a matter of law is reviewed de novo. *See MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1214 (11th Cir. 2021). A court should grant a motion for judgment as a matter of law only when it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The evidence must be viewed in the light most favorable to the non-moving party, Highland, and all inferences must be drawn in Highland's favor. *Cleveland v. Home*

*Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)).

### B.    The evidence supports the jury's verdict in favor of Highland on the DTSA claim.

The Defend Trade Secrets Act states, "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The term "owner" is defined as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." *Id.* at § 1839(4).

The jury was not instructed on the statutory definition of ownership, nor did Minjares request such an instruction. The jury was given the pattern instruction, which states, "To prove that The Highland Consulting Group, Inc. owns [the trade secrets], it must prove that [the trade secrets] are The Highland Consulting Group, Inc.'s property." (Doc. 233 p. 9). Minjares accepted this instruction (Vol. 3, p. 9-10, 203).

The jury instructions identified the following trade secrets: "Mining Practices processes and methodologies of One Highland, Discovery & Design™ methods, sales presentations with compilations of prior results, pricing formulas, or proprietary Prospectus algorithms." (Doc. 233, p. 9). The jury found Highland owns these trade secrets (Doc. 228, p. 1).

Minjares does not challenge the jury's determination that these are trade secrets or that he misappropriated them. Those issues are waived.[2] *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1269 (11th Cir. 2007). The sole issue is whether Highland provided sufficient evidence for the jury to determine that it owned these trade secrets. It did.

Highland produced testimony and evidence that it owns the trade secrets at issue. The jury heard evidence about Highland's development of these trade secrets, including detailed evidence about One Highland (developed in 2013), Highland's Mining Vertical—Best Practices document (developed in 2014), and Highland's financial Prospectus (developed in 2014) (Doc. 341, pp. 119-20, 131, 147-48, 160-62; Doc. 342, pp. 14-15). These trade secrets were used to create a uniform method

---

[2] Despite not challenging the jury's finding that these are trade secrets, Minjares refers to them as the "alleged trade secrets" in his brief. Highland will refer to them as "the trade secrets."

for Highland to conduct business across the globe (Doc. 341, pp. 147-48, 160-62; Doc. 342, p. 14). Highland developed these trade secrets over the course of many years using its significant consulting expertise (Doc. 341, pp. 147-48, 179).

The jury reviewed hundreds of pages of documentary evidence of these trade secrets bearing the logo "The Highland Group Consultants," which Kerridge testified is Highland's logo (Doc. 341, pp. 178, 187; Plf. Exs. 2, 24, 113, 134, 136). For example, the 285-page Mining Vertical document contains Highland's logo at the top of each page (Plf. Ex. 134; Doc. 341, p. 178, 187; Doc. 342, p. 150). The sales document found on Accenture's server, which originated from a Highland sales document, also contains Highland's logo (Plf. Ex. 136, pp. 7, 13, 23).

The jury heard testimony about the value of these trade secrets to Highland, including Highland's use of the trade secrets in multiple industries and geographical markets (Doc. 341, pp. 147-48, 160-62, 180-81; Doc. 342, pp. 14-15). And, the jury heard that Highland controls disclosure of the trade secrets and takes measures to protect them, such as storing them in password-protected document storage accounts and requiring non-disclosure agreements from its employees, consultants, subcontractors and clients who have access to them (Doc. 341, pp. 120-22, 148-49, 159-60, 162; Doc. 342, p.15). The weight of this evidence demonstrates that the

plaintiff, Highland, owns these trade secrets under the definition of "owner" in the DTSA.

Instead of viewing the facts and reasonable inferences in Highland's favor, Minjares draws inferences in his own favor. He relies on these improper inferences to assert he is entitled to judgment as a matter of law. For example, Minjares points out that Kerridge testified he developed one of the models in One Highland (Minjares's Brief at pp. 14, 31, referencing Doc. 341, p. 153). From this, Minjares infers One Highland was not developed specifically for the plaintiff, Highland. However, the more likely and reasonable inference is that Kerridge, 100% owner of the plaintiff, Highland, developed that model for Highland, in his role as owner of Highland. Kerridge confirmed he was testifying in his role as CEO of the plaintiff, Highland (Doc. 342, p. 86).

As another example, Minjares asserts, without citation to the record, that "executives from the separately incorporated entities outside the U.S. and Kerridge" developed the One Highland and Mining Practices document (Minjares's Brief at p. 31). Minjares presented no evidence that the consultants who developed the One Highland and Mining Vertical documents were employed by an entity other than Highland. Kerridge testified that in 2014, "a specialized team of **our** senior mining

25

focused practitioners, leaders, and consultants embarked on a follow on effort [to One Highland] to develop best practices focused specifically on the mining vertical." (Doc. 341, pp. 160-61; emphasis added). The Mining Vertical document is "the product of that effort that went on for a period of months." (Doc. 341, p. 161). The most reasonable inference from this testimony, in the context of all of Kerridge's other testimony, is that the "senior mining focused practitioners, leaders, and consultants" worked for Highland, not another entity. The documents these consultants created were used across geographic locations and, in the case of One Highland, across many industries. They were not developed for specific affiliates or consulting projects.

Finally, Minjares infers Highland does not own the trade secrets because Highland affiliates use some of the trade secrets during consulting projects in other countries (Minjares's Brief at pp. 16, 29-30). This ignores the measures that Highland takes to safeguard its trade secrets when they are used by affiliates, including requiring confidentiality and non-disclosure agreements with its employees, subcontractors, and clients, and keeping the trade secrets in password-protected document storage services. This is consistent with Kerridge's testimony that these trade secrets were models for Highland's consultants to use in projects throughout the world so Highland can conduct business in a cohesive, unified

manner. The fact that the affiliates, like HCG Advisors, entered into the project implementation contracts with foreign clients is irrelevant to the question of trade secret ownership.

These are only three examples of the many inferences Minjares makes in his favor throughout his brief. His argument does not survive without making these improper inferences. When there is evidence that the trade secret is owned by the plaintiff, as there is here, the jury's determination of ownership should be upheld, even when the defendant has presented contrary evidence. *See Title Source, Inc. v. HouseCanary, Inc.*, 612 S.W.3d 517, 528-30 (Tex. Ct. App. 2020) (review denied June 17, 2022) (applying the Texas Uniform Trade Secret Act, which uses a nearly identical definition of "owner" to the DTSA, and holding the plaintiff produced sufficient evidence of ownership to create a jury question). Viewed as a whole, with the reasonable inferences in Highland's favor, Highland produced sufficient evidence it owned the trade secrets.

Minjares ignores the context of the testimony and faults Highland for not using its full legal name each time its witnesses discussed Highland's trade secrets. This argument is without merit. Highland's counsel told the jury in opening statement that "Highland" meant his client, the plaintiff (Doc. 341, p. 89). Then,

consistent with this explanation, Highland's counsel and Highland's witnesses referred to the plaintiff as "Highland," not the full legal name, The Highland Consulting Group, Inc. There was no confusion on this issue.

Over and over, Kerridge testified that the trade secrets belonged to Highland. (Doc. 341, pp. 147-48, 153, 157, 160-61, 187; Doc. 342, pp. 11-12, 26). From the context of his testimony, it was clear that Highland meant the plaintiff, The Highland Consulting Group, Inc. When pressed on cross-examination to concede otherwise, Kerridge made clear the trade secrets belong to Highland:

> Q. You mentioned a sales document that was on Accenture's server; is that right?
>
> A. That's correct.
>
> Q. A sales document belongs to the sales person, Mr. Peacock in this case, correct?
>
> A. No.
>
> Q. Mr. Peacock doesn't make the sales and use documentation to make the sale?
>
> A. **It doesn't belong to him, it belongs to me, my company, the Highland Group. It didn't belong to Mr. Peacock.**

(Doc. 342, p. 83). Minjares's counsel questioned Kerridge about the capacity in which he was testifying at trial. Kerridge confirmed he was testifying for the plaintiff, in his role as CEO of the plaintiff (Doc. 342, p. 86). Minjares never cross-

examined Kerridge about which entity owned the trade secrets. The jury had abundant evidence to conclude that the plaintiff owned the trade secrets.

In footnote 7 of his brief, Minjares makes an important point that supports Highland's argument, not Minjares's. Minjares asserts that "HCGI failed to expressly plead that it was the owner of the alleged trade secrets, and instead, referring to itself as 'Highland,' alleged ownership indirectly by stating 'Highland's trade secrets.'" (Minjares's Brief at p. 21, n.7). To the contrary, the first page of Highland's complaint defines "Highland" to mean "The Highland Consulting Group, Inc." (Doc. 1, p. 1). Both parties referred to the plaintiff as "Highland" in various motions and responses (*See, e.g.*, Docs. 40, 125, 166, 167). It has been clear throughout this case that "Highland" refers to the plaintiff in this lawsuit.

Highland did not disregard its corporate form, contrary to Minjares's argument. Highland clearly explained to the jury its corporate structure and its use of affiliate companies in foreign locations, for specific consulting projects (Doc. 341, pp. 125-26; Doc. 343, pp. 58-59). Highland's trade secret claims do not arise from the Saucito mine project or any other specific consulting project. They arise from Minjares's misappropriation of Highland's foundational trade secret documents, which are used by Highland throughout its consulting business.

Highland, the plaintiff, conducts marketing and sales, performs the Discovery & Design® phase, and formulates proposals for potential clients (Doc. 341, pp. 119, 131). Kerridge and Saville testified about the multi-year, targeted marketing and sales effort Highland directed to Fresnillo (Doc. 341, p. 128; Doc. 342, p. 141). Highland entered into the contract for Discovery and Design® with Fresnillo (Doc. 341, pp. 128-29; Doc. 342, pp. 112-13). Highland also signed a Mutual Confidentiality Agreement with Fresnillo (Doc. 241-15; Doc. 341, pp. 129-30). Highland used its affiliate company, HCG Advisors, for the Fresnillo project phase because the contract exceeded 183 days and triggered local tax requirements (Doc. 341, p. 125; Doc. 342, pp. 142-43; Doc. 343, pp. 58-59).

The trade secrets were developed so Highland could maintain a cohesive and consistent process in all of its markets, no matter which entity or affiliate conducted the project (Doc. 341, pp. 147-48, 162). The existence of these affiliates, and Highland's use of them to conduct consulting projects, does not contradict Highland's claim that it owns the trade secrets. Minjares presented no evidence that any affiliate, or any other entity besides the plaintiff, owned these trade secrets.

Highland met its burden of proving it owned the trade secrets. The district

court properly denied Minjares's motion for judgment as a matter of law.

## C. Highland had standing to sue Minjares for misappropriation of trade secrets under the DTSA.

To establish standing, a plaintiff must show that: (1) the plaintiff has suffered an injury-in-fact; (2) the injury is fairly traceable to the defendant; and (3) the injury is likely to be redressed. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Highland proved standing for all the reasons addressed above Part B of this brief. Highland introduced significant evidence it owned the trade secrets that Minjares misappropriated and, therefore, suffered an injury-in-fact.

Minjares does not cite any case with similar facts to this case, which a jury decided the issue of ownership after hearing all of the evidence. Instead, Minjares relies on cases where the plaintiff conceded it did not own the trade secrets or transferred the rights to those trade secrets, or where the defendant claimed to own the trade secrets. (Minjares's Brief at pp. 34-39). The discussion of ownership in those cases is inapplicable here. No other entity claimed ownership of the trade secrets, nor was there evidence Highland transferred them to anyone (including its affiliates or subsidiaries). Highland's position throughout this case was that it owned the trade secrets.

*Phyllis Schlafly Revocable Trust v. Cori*, 4:16-cv-01631-JAR, 2022 WL 898760 (E.D. Mo. March 28, 2022), a case Minjares relies on heavily to make its argument, is factually distinguishable and inapplicable. The plaintiff admitted it did not own the trade secrets. *Id.* at *2. The plaintiff's theory was that it should "fictionally" be treated as owner of the trade secrets because it "function[ed] in harmony" with the actual owner and the licensee of the trade secrets. *Id.* at *2-3. The Missouri district court rejected this argument under the DTSA and granted summary judgment for the defendants. *Id.* at *3. In sharp contrast, Highland never conceded another entity owned the trade secrets. It introduced evidence that Highland exclusively owned the trade secrets and the jury found in Highland's favor on that fact issue.

Similarly, the plaintiffs in *Focused Impressions, Inc. v. Sourcing Group, LLC*, No. 19-cv-11307-ADB, 2020 WL 1892062, at *4-5 (D. Mass. Apr. 16, 2020), *Pioneer International (USA) Inc. v. Reid*, No. 2:07-cv-84-FtM-34 DNF, 2007 WL 9718721, at *3, 6-7 (M.D. Fla. Oct. 9, 2007), and *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419-20 (S.D.N.Y. 2021), admitted other entities owned the trade secrets. Those plaintiffs claimed they could sue under the DTSA based on their relationship to the actual owners.

By relying on these cases, Minjares creates, and then refutes, a straw man argument. These cases were decided pre-trial, based on concessions the plaintiffs made that conflicted with the DTSA's requirement of ownership. In sharp contrast, Minjares never contested Highland's standing before trial and Highland never made such a concession. Highland and Minjares presented their evidence to a jury. Highland presented evidence it owned the trade secrets. The jury found for Highland. Highland had standing to bring its DTSA claim.

## II. MINJARES IS NOT ENTITLED TO A NEW TRIAL ON HIGHLAND'S DTSA CLAIM BECAUSE THE EVIDENCE SUPPORTS THE JURY'S VERDICT THAT HIGHLAND OWNED THE TRADE SECRETS.

### A. Standard of review

This Court reviews the denial of a motion for new trial under the abuse of discretion standard. *Ins. Co. of N. Am. v. Valente*, 933 F.2d 921, 923 (11th Cir. 1991). A new trial should not be granted unless the verdict is against the great weight of the evidence. *Id.*

### B. The jury's verdict in favor of Highland on the DTSA claim is supported by the great weight of the evidence and must be upheld.

For all the reasons addressed above, Minjares is not entitled to a new trial. Highland produced significant evidence it owns the trade secrets at issue. This Court

must defer to the district court's "'first-hand experience of the witnesses, their demeanor, and [the] context of the trial.'" *Id.* (quoting *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1498 (11th Cir. 1987)). The district court denied Minjares's motion for new trial because he failed to show that the great weight of the evidence did not support the jury's verdict. This Court should affirm that ruling.

## <u>CONCLUSION</u>

This Court should affirm the final judgment.

DATED: October 5, 2022

Respectfully submitted,

By: /s/ *Stephanie L. Serafin*
**Stephanie L. Serafin**
Florida Bar No. 58390
Counsel for Appellee, The Highland Consulting
Group, Inc.

**Stephanie L. Serafin**
Fla. Bar No. 58390
**Rebecca Mercier Vargas**
Fla. Bar No. 0150037
**Kreusler-Walsh, Vargas & Serafin, P.A.**
501 South Flagler Drive, Suite 503
West Palm Beach, FL 33401-5913
(561) 659-5455
Primary:     sserafin@kwvsappeals.com
                  rvargas@kwvsappeals.com
Secondary:   efiling@kwvsappeals.com
                  kwvsappeals@gmail.com
Counsel for Appellee, The Highland Consulting
Group, Inc.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 6,833 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

By: /s/ *Stephanie L. Serafin*
       **Stephanie L. Serafin**
       Florida Bar No. 58390
       Counsel for Appellee, The Highland Consulting
       Group, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of October, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filings.

By: /s/ *Stephanie L. Serafin*
       **Stephanie L. Serafin**
       Florida Bar No. 58390
       Counsel for Appellee, The Highland Consulting
       Group, Inc.